**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICHAEL KENT,<br><br>Plaintiff,<br><br>v.<br><br>MAGELLAN HEALTH, INC., STEVEN J. SHULMAN, SWATI ABBOTT, CHRISTOPHER J. CHEN, KENNETH J. FASOLA, PETER A. FELD, MURAL R. JOSEPHSON, G. SCOTT MACKENZIE, LESLIE V. NORWALK, and GUY P. SANSONE,<br><br>Defendants. | ) | Case No._______________<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Kent ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Magellan Health, Inc. ("Magellan" or the "Company") and the members of Magellan's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Magellan will be acquired by Centene Corporation ("Centene") through its wholly owned subsidiary Mayflower Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2. On January 4, 2021, Magellan and Centene issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated January 4, 2021 (the "Merger Agreement") to sell Magellan to Centene. Under the terms of the Merger Agreement, each holder of Magellan common stock will receive $95.00 in cash for each share of Magellan common stock they own (the "Merger Consideration"). The Proposed Transaction is valued at approximately $2.2 billion.

3. On February 19, 2021, Magellan filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that Magellan stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (a) the Company's financial projections and the financial analyses supporting the fairness opinions provided by the Board's financial advisors, Goldman Sachs & Co. LLC ("Goldman") and Guggenheim Securities, LLC ("Guggenheim"); and (b) the background of the Proposed Transaction. Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. It is imperative that the material information omitted from the Registration Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

5. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to the Company's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

7. This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District.

## THE PARTIES

9. Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Magellan.

10. Defendant Magellan is a Delaware corporation, with its principal executive offices located at 4801 E. Washington Street, Phoenix Arizona 85034 and an office located at 2650 Camino Del Rio N, San Diego, California 92108. The Company is a leader in managing fast growing, complex areas of health, including special populations, complete pharmacy benefits and other specialty areas of healthcare. Magellan's common stock trades on the NASDAQ Global Select Market under the ticker symbol "MGLN."

11. Defendant Steven J. Shulman ("Shulman") has been Chairman of the Board and a director of the Company since 2019.

12. Defendant Swati Abbott ("Abbott") has been a director of the Company since 2018.

13. Defendant Christopher J. Chen ("Chen") has been a director of the Company since 2020.

14. Defendant Kenneth J. Fasola ("Fasola") has been Chief Executive Officer ("CEO") and a director of the Company since November 2019.

15. Defendant Peter A. Feld ("Feld") has been a director of the Company since 2019.

16. Defendant Mural R. Josephson ("Josephson") has been a director of the Company since 2020.

17. Defendant G. Scott MacKenzie ("MacKenzie") has been a director of the Company since 2016.

18. Defendant Leslie V. Norwalk ("Norwalk") has been a director of the Company since 2019.

19. Defendant Guy P. Sansone ("Sansone") has been a director of the Company since 2019.

20. Defendants identified in paragraphs 10-18 are referred to herein as the "Board" or the "Individual Defendants."

21. Non-party Centene is a Delaware corporation, with its principal executive offices located at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene operates as a multi-national healthcare enterprise that provides programs and services to under-insured and uninsured individuals in the United States. Centene's common stock trades on the New York Stock Exchange under the ticker symbol "CNC."

22. Non-Party Merger Sub is a Delaware corporation and a wholly owned subsidiary of Centene.

**SUBSTANTIVE ALLEGATIONS**

**The Proposed Transaction**

23. On January 4, 2021, Magellan and Centene issued a joint press release announcing the Proposed Transaction. The press release states, in relevant part:

> ST. LOUIS and PHOENIX, Jan. 4, 2021 -- Centene Corporation (NYSE: CNC) and Magellan Health, Inc. (NASDAQ: MGLN) today announced that they have entered into a definitive merger agreement under which Centene will acquire Magellan Health for $95 per share in cash for a total enterprise value of $2.2 billion. The transaction, which was unanimously approved by the Boards of Directors of both companies, will broaden and deepen Centene's whole health capabilities and establish a leading behavioral health platform. The combined platform lays the foundation by which the company will continue to invest and innovate for its members, enabling improved health outcomes and faster, diversified growth.
>
> The combination brings together the companies' complementary capabilities in behavioral health, specialty healthcare and pharmacy management. As a result of the transaction, Centene will establish one of the nation's largest behavioral health platforms across 41 million unique members with enhanced capabilities to deliver better health outcomes for complex, high-cost populations. Magellan Health will also add to Centene's leadership in government sponsored healthcare, bringing 5.5 million new members on government-sponsored plans. Magellan Health also provides specialty health services for 18 million third-party customer members in addition to Centene's own members. Furthermore, the transaction adds 2 million PBM members and 16 million medical pharmacy members, enhancing the scale of Centene's pharmacy platform with leading capabilities in specialty drug management. As part of Centene's Health Care Enterprises, Magellan Health will continue to independently support its existing customers and pursue growth opportunities. In addition, the transaction will create attractive shareholder returns through enhanced service capabilities, cross-sell opportunities and increased engagement with third-party customers.
>
> "There is a critical need for a fundamentally better approach to supporting people with complex, chronic conditions through better integration of physical and mental health care. This has become even more evident in light of the pandemic which has driven a dramatic rise in behavioral health needs," said Michael F. Neidorff, Chairman, President and Chief Executive Officer of Centene. "This acquisition accelerates our diversification strategy and enhances our ability to build next generation capabilities in our specialty care business by leveraging our scale and investments in technology. Furthermore, we are very familiar with the range of Magellan Health's healthcare solutions as we have been one of their customers over many years, and our shared commitment to taking care of the most vulnerable populations makes this transaction a natural step."

"We're thrilled to bring together two businesses with complementary capabilities and a shared commitment to driving higher quality care for our members while lowering overall healthcare costs," said Kenneth J. Fasola, Chief Executive Officer of Magellan Health. "By joining Centene under the Health Care Enterprises umbrella, we will maintain the independence necessary to ensure continued service to our third-party customers while accelerating the introduction of innovative solutions and reimagining behavioral health. I look forward to continuing to lead Magellan Health as we create exciting new opportunities for our customers and employees who will benefit from the creation of a best-in-class platform that meets our members' needs today and in the future."

**Strategic and Financial Benefits of the Transaction:**

- **Broadening and deepening Centene's whole health capabilities at a critical time**: the acquisition increases Centene's scale and capability in behavioral care at a time when more than 2 in 5 Americans are struggling with mental or behavioral health issues associated with the COVID-19 pandemic. In addition, the sickest 5% of the population consume 50% of healthcare spending and Magellan Health's behavioral health, specialty health and pharmacy offerings focus on the portion of this spend that is addressable.
- **Advancing Centene's specialty care and Health Care Enterprises platforms**: the transaction brings additional scale in the company's growing specialty care division and complements Centene's evolving Health Care Enterprises portfolio, aligned with delivering the latest technologies and services across the full spectrum of its members.
- **Enabling better health outcomes at lower total medical costs**: by combining both companies' capabilities in behavioral health and specialty healthcare, the acquisition enables more integrated solutions across physical and mental health to deliver better health outcomes at lower costs for complex, high-cost populations.
- **Value creation for shareholders**: the acquisition will create attractive opportunities to grow Centene's specialty care business with enhanced services, new product development and additional third party relationships. Centene expects the transaction to be slightly accretive in the first full year and deliver low to mid-single digit percent adjusted EPS accretion from the transaction by the second full year, including approximately $50 million in annual net cost synergies projected by the second full year. The net synergies are in addition to the cost reduction plan of $75 million already initiated by Magellan Health.

**Organization and Leadership**

Ken Fasola, CEO of Magellan Health, and other members of Magellan Health's leadership team have agreed to join Centene to provide continuity to Magellan Health's strategy and leadership.

> **Timing and Required Approvals**
>
> The transaction is subject to clearance under the Hart-Scott Rodino Act, receipt of required state regulatory approvals, the approval of the definitive merger agreement by Magellan Health's stockholders and other customary closing conditions. In connection with the transaction, affiliates of Starboard Value LP, which own approximately 9.4% of Magellan Health's outstanding shares of common stock in the aggregate, have entered into a merger support agreement whereby they have agreed to vote their shares in favor of the transaction at Magellan Health's special meeting.
>
> The transaction is not contingent upon financing. Centene intends to primarily fund the cash portion of the acquisition through debt financing, and J.P. Morgan has provided a $2.381 billion bridge financing commitment. Upon closing, Centene expects its debt-to-capital ratio to be in the low 40% range, and intends to use its strong earnings and cash flows to achieve its targeted debt-to-capital ratio in the upper 30% range within 12 to 18 months post close.
>
> Centene and Magellan Health expect to complete the transaction in the second half of 2021.

**The Proxy Statement Contains Material Misstatements or Omissions**

24. Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Magellan's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

25. Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (a) the Company's financial projections and the financial analyses supporting the fairness opinions provided by the Board's financial advisors, Goldman and Guggenheim; and (b) the background of the Proposed Transaction.

***Material Omissions Concerning the Company's Financial Projections and Goldman's and Guggenheim's Financial Analyses***

26. The Proxy Statement omits material information regarding the Company's financial projections.

27. For example, with respect to Magellan's "October 2020 Forecasts" and "January 2021 Forecasts," the Proxy Statement fails to disclose all line items underlying unlevered free cash flow.

28. The Proxy Statement also omits material information regarding Goldman's and Guggenheim's financial analyses.

29. The Proxy Statement describes Goldman's and Guggenheim's fairness opinions, and the various valuation analyses they performed in support of their opinions. However, the description of Goldman's and Guggenheim's fairness opinions and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Magellan's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Goldman's and Guggenheim's fairness opinions in determining whether to vote in favor of the Proposed Transaction or seek appraisal.

30. With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (a) the Company's estimated terminal year EBITDA; (b) quantification of Magellan's terminal value; (c) quantification of the inputs and assumptions underlying the discount rates ranging from 7.0% to 8.0%; (d) Magellan's net debt; and (e) Magellan's total number of fully diluted outstanding shares.

31. With respect to Goldman's *Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose a quantification of the inputs and assumptions underlying the discount rate of 8.5%.

32. With respect to Guggenheim's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (a) the Company's estimated terminal year unlevered free cash flow;

(b) quantification of Magellan's terminal value; and (c) quantification of the inputs and assumptions underlying the discount rates ranging from 7.5% to 8.5%.

33. With respect to Guggenheim's *Wall Street Research Analyst Stock Price Targets* analysis, the Proxy Statement fails to disclose: (a) the individual price targets observed in the analysis; and (b) the sources thereof.

34. Without such undisclosed information, Magellan stockholders cannot evaluate for themselves whether the financial analyses performed by Goldman and Guggenheim were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that positive fairness opinions could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Goldman's and Guggenheim's opinions and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

35. The omission of this material information renders the statements in the "Certain Forecasts," "Opinion of Goldman Sachs & Co. LLC," and "Opinion of Guggenheim Securities LLC" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background of the Proposed Transaction***

36. The Proxy Statement fails to disclose material information concerning the background of the Proposed Transaction.

37. For example, the Proxy Statement fails to disclose the terms of any confidentiality agreements the Company entered into with potential bidders. According to the Proxy Statement, following Goldman's March 4, 2019 outreach, 24 parties entered into confidentiality agreements

with Magellan. Proxy Statement at 30. "Those confidentiality agreements, with certain exceptions, included standstill provisions that prohibited the third party from requesting waivers of the standstill restrictions." *Id.* In late February 2020, "a number of parties [ ] entered into amendments to the confidentiality agreements previously executed . . . to extend the time periods during which the standstill and non-solicitation and no-hire provisions contained therein would be in effect[.]" Id. at 32. The Proxy Statement fails, however, to disclose how many of the confidentiality agreements include "don't-ask, don't-waive" ("DADW") standstill provisions and whether the DADW provisions are still in effect and presently precluding any potential counterparty from submitting a topping bid for Magellan.

38. The Proxy Statement further discloses in connection with the Board's "Reasons for Recommending the Adoption of the Merger Agreement" that:

> [A]lthough standstill restrictions under six confidentiality agreements . . . remained in effect in accordance with their terms following the execution and delivery of the Merger Agreement, five of which standstill restrictions prohibited the making of confidential proposals to the Board, Magellan would be permitted to waive such standstill restrictions in certain circumstances to the extent necessary to permit the counterparty to make a confidential alternative acquisition proposal to the Board[.]

*Id.* at 55. Yet, the Proxy Statement fails to disclose the "certain circumstances" under which the Board would be permitted to waive the standstill provisions, and whether the six parties would be permitted to request such a waiver under the terms of the confidentiality agreements.

39. The failure to disclose the existence of DADW provisions creates the false impression that a potential bidder who entered into a confidentiality agreement could make a superior proposal for Magellan. If the potential acquirer's confidentiality agreement contains a DADW provision, then that potential bidder can only make a superior proposal by (a) breaching the confidentiality agreement—since in order to make the superior proposal, it would have to ask

for a waiver, either directly or indirectly; or by (b) being released from the agreement, which if action has been done, is omitted from the Proxy Statement.

40. Any reasonable Magellan stockholder would deem the fact that a likely topping bidder may be precluded from making a topping bid for the Company to significantly alter the total mix of information.

41. The omission of this material information renders the statements in the "Background of the Merger" and "Reasons for Recommending the Adoption of the Merger Agreement" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

42. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other Magellan stockholders will be unable to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

43. Plaintiff repeats all previous allegations as if set forth in full.

44. During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

45. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the Company's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Goldman and Guggenheim and the background of the Proposed Transaction. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

46. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or seek to exercise their appraisal rights.

47. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

48. Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Claims Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49. Plaintiff repeats all previous allegations as if set forth in full.

50. The Individual Defendants acted as controlling persons of Magellan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Magellan, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement

filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

51. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

53. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

54. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of defendants' conduct, Magellan's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Magellan, and against defendants, as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Magellan stockholders;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: March 9, 2021

**LONG LAW, LLC**

By: */s/ Brian D. Long*
Brian D. Long (#4347)
3828 Kennett Pike, Suite 208
Wilmington, DE 19807
Telephone: (302) 729-9100
Email: BDLong@longlawde.com

*Attorneys for Plaintiff*